IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CARL F. HUGHES,                                :
in his capacity as guardian for                :
MARTIN J. HUGHES, JR.,                         :
                                               :
                                               :        Case No. C2-05-0077
              Plaintiff,                        :
                                               :     JUDGE ALGENON L. MARBLEY
       v.                                       :
                                               :
DOUG WHITE,                                    :        Magistrate Judge Kemp
Director of Ohio Department of                 :
Commerce, *et al.*                             :
                                               :
              Defendants.                       :

**OPINION AND ORDER**

**I. INTRODUCTION**

This matter comes before the Court on the following motions: (1) Defendants' Joint

Motion for Summary Judgment as to Counts II and III of Plaintiff's Second Amended Complaint;

(2) Defendants Doug White, F. Scott O'Donnell and Kenneth A. Roberts's (the "State

Defendants") Motion for Partial Summary Judgment as to Count I of Plaintiff's Second

Amended Complaint in this matter and as to Counts II, III, and IV of Case Number C2-05-0424;[1]

and (3) Plaintiff's Motion for Partial Summary Judgment as to several of Defendants' affirmative

---

[1]Case C2-05-0424 has been consolidated with the current matter C2-05-077. In Case C2-05-077, the United Telephone Credit Union, Inc. v. Kenneth Roberts, et. al., UTCU seeks to have Ohio Revised Code Sec. 1733.361 declared unconstitutional as violating Plaintiff's due process rights. As per a stipulation dated October 23, 2006, this portion of this case has been dismissed. Therefore, Defendant White, O'Donnell and Robert's Motion is applicable only as to Count I of Case Number C2-05-077.

defenses.  For the reasons stated herein, this Court **GRANTS** Defendants' Joint Motion for Summary Judgment as to Counts II and III, **GRANT**S State Defendants' Motion for Summary Judgment as to Count I, and **DISMISSES as MOOT** Plaintiff's Motion for Partial Summary Judgment.

## II. BACKGROUND

### A. RELEVANT FACTS

Plaintiff Charles F. Hughes, brings this action in his capacity as guardian for Martin J. Hughes, Jr. ("Hughes").  Plaintiff asserts three claims for relief.  In Count I of Plaintiff's Second Amended Complaint (the "Complaint"), Plaintiff asserts that Defendants violated Hughes' federal due process right under the Fourteenth Amendment.  In Counts II and III of the Complaint, Plaintiff claims that Hughes is the beneficiary of a purported Employee Retirement Income Security Act ("ERISA") employee benefit plan sponsored by United Telephone Credit Union, Inc. ("UTCU") which entitles him to deferred compensation and other retirement benefits.  Specifically, Plaintiff claims that Hughes' employee benefits should consist of approximately: (1) $1.1M in deferred compensation retroactive to November 1987; (2) $76K in unpaid salary relating to the period from February 28, 2003 through some time in 2004; (3) $40K in unpaid vacation from 2000-2004; (4) $405K representing a disability benefit of four times Hughes' last annual salary at UTCU; and (5) $506K representing a death benefit of five times Hughes' last annual salary at UTCU.

Defendants consist of Dough White ("White"), Director of the Ohio Department of Commerce, F. Scott O'Donnell ("O'Donnell"), Superintendent of the Division of Financial Institutions ("DFI"), Kenneth A. Roberts ("Roberts"), Acting Deputy Superintendent for Credit

2

Unions, and American Mutual Share Insurance Corporation ("ASI") as Conservator for UTCU.

Hughes worked for the Communication Workers of America ("CWA") from the early 1950's until December 1987. The last position Hughes held at CWA was District 4 Vice President. In December 1987, Hughes retired from CWA as a result of his federal court conviction for making false reports, which prohibited him from serving as an officer of a labor organization. From 1957 to 1987 Hughes served as a director and Secretary/Treasurer of UTCU. The Parties do not dispute that he served in an unpaid capacity and neither received nor is entitled to benefits or compensation for this period.

UTCU is a state chartered credit union organized and existing under the provisions of Chapter 1733 of the Ohio Revised Code. As such, the credit union is a nonprofit cooperative financial institution organized and operating for the mutual benefit and general welfare of its members. UTCU is subject to the supervision and regulation of the Ohio Department of Commerce, Division of Financial Institutions ("DFI").

On November 28, 1987, the UTCU board met and adopted the following:

> Motion Carried: To approve the salary of Martin J. Hughes as an employee at his current pay level. (the "1987 Board Motion")

As of November 1987, Hughes served on the board of directors of UTCU and as its Secretary but did not draw a salary. There is no documentation that establishes the amount that Hughes' salary was supposed to be. In fact, Hughes did not collect a salary from UTCU from 1987 through 1999. Hughes, however, was employed and did collect a salary of approximately $60K per year from Union Eye Care Center from 1988 through at least 1999.

Plaintiff claims that the 1987 Board Motion established a deferred compensation plan for

3

Hughes which is covered by ERISA. Plaintiff contends that it was made clear at the board meeting that the salary referenced in the 1987 Board Motion was to be linked to the salary that Hughes formerly earned at CWA. Further, Plaintiff asserts that instead of paying Hughes an annual salary, UTCU would defer the salary on his behalf. Robert Sorin ("Sorin"), a member of UTCU's audit committee, agrees that sometime in the 1980's UTCU's board decided Hughes should receive a salary and that UTCU would accrue this salary for him. Plaintiff has produced no physical documentation indicating the nature of the benefits Hughes was to receive, the amount of benefits Hughes was to receive, the method by which Hughes was to receive these benefits, or the formula by which UTCU was to accrue them. DFI, pursuant to R.C. Sec. 1733.32(3), makes periodic examinations of the records of UTCU; in its 1987 examination report, DFI did not comment or otherwise acknowledge the 1987 Board Motion.

Plaintiff contends that on January 28, 1989 the UTCU board approved the following:

> Motion Carried: To set aside earnings to pay salary and benefits for Martin J. Hughes for services rendered on behalf of this Credit Union and to anyone designated by the Board of Directors who may perform similar services. (the "1989 Board Motion")

In support of his contention that UTCU did indeed pass the 1989 Board Motion, Plaintiff offers a signed copy of the board minutes from the 1989 board meeting. Plaintiff does not offer evidence on the amount, nature, or type of benefits that the 1989 Board Motion was supposed to convey on Hughes, nor when Hughes was to receive these benefits. Defendants make no mention of the 1989 Board Motion or its contents in their brief.

4

Plaintiff further contends that on July 24, 1999, UTCU's board[2] approved a resolution acknowledging the 1987 Board Motion, adopting as Hughes' salary the sum of $90K per year, and establishing death or disability benefit for Hughes in the amount of four times his annual salary. (the "1999 Board Motion). Additionally, at the end of 1999 and around the time that Hughes terminated his employment relationship with Union Eye Care Center, Plaintiff entered into an employment contract with UTCU (the "1999 Contract"). The 1999 Contract provided that Hughes was to be paid $90K annually for a term of fifteen years as compensation for his services as Chairman and CEO of UTCU. It further specifies that Hughes was entitled to received a death benefit of five times his last annual salary and five weeks of paid vacation. In Section 8, the 1999 Contract also states that Hughes shall be "eligible to participate in any 401(k), pension," and other retirement programs "now or in the future."

As additional evidence of the existence of an ERISA plan for Hughes, Plaintiff remarks that an "accrued benefits" line item appears as a liability on UTCU's financial statements starting in 1989. Plaintiff offers the existence of this line item as evidence that the 1987 Board Motion established a deferred compensation package for Hughes. Described only as an "Accrued Benefits" liability, this line item showed a liability of $120,000 in 1989, $240,000 in 1990, and $280,000 in 1991. This accrued liability did not increase between 1991 and 2002. Plaintiff avers that the accrued benefits line represents the deferred compensation owed Hughes per the 1987 and 1989 Board Motions.

During 1989, 1990, and 1996 DFI conducted periodic examinations of UTCU which

_____

[2]In 1999, UTCU's board consisted of Hughes, his wife, his cousin, and two of his neighbors.

5

included examining UTCU's financial records and board meeting minutes. In its November 1990 examination report, DFI stated:

> There are some accounts that cannot be adequately explained to the examiners . . . Approximately $200,000 is being set aside, as a payable (accrued expense) for unspecified future "employee benefits." The Board of Directors should determine what form these benefits will take and so specify in the minutes.

This report establishes DFI's knowledge of the existence of certain "employee benefits" but also establishes that these benefits were "unspecified." DFI did not know what the benefits represented (deferred compensation, retirement, benefits, disability benefits, etc.), to whom they would be paid, when they would be paid, or how they would be paid. UTCU never complied with the directive in DFI's 1990 report to establish what form these unspecified benefits would take and DFI did not broach the issue in its subsequent reports.

In late 2001, DFI began another periodic examination of UTCU. During this examination, DFI found numerous instances of accounting and Internal Revenue Service regulatory noncompliance, self-dealing, inadequate investment policies, and breach of fiduciary duties by management and the UTCU board of directors. UTCU was ordered to implement over twenty specific corrective actions. One of DFI's major objections was the 1999 Contract, which DFI considered a form of self-dealing by Hughes. DFI objected to the contract because of the fifteen year employment term, which DFI believed to be too long, the lack of termination provisions, and the large death benefit.

On July 18, 2002, after a supervisory conference, DFI and the former officers and directors of UTCU, including Martin J. Hughes, Jr., his wife Natalie A. Hughes, and Daniel P. Hughes, a Hughes relative, entered into supervisory agreement (the "Supervisory Agreement")

6

pursuant to OHIO REV. CODE § 1733.325. The Supervisory Agreement was designed to rectify the problems that DFI found at UTCU. As part of the Supervisory Agreement, DFI ordered UTCU to increase the accrued liability line item of UTCU's financial statements from $280,000 to $450,000 to reflect the "death benefit due and payable within 60 days after [Hughes] death."[3] Defendants claim that Hughes had, on several occasions, maintained that the accrued liability line item represented a death benefit that UTCU owed him. Plaintiff asseverates that Hughes did not make these comments and that this line item reflects deferred compensation owed to Hughes as a result of the 1987 and 1989 Board Motions. On February 28, 2002, Hughes increased the accrued benefits line item to $506,198, a figure which represents exactly five times his annual salary.

UTCU and its board failed to implement the corrective actions specified in the Supervisory Agreement. Additionally, DFI determined, based on an ongoing examination, that on November 1, 2001, UTCU unlawfully transferred 1,742 shares of stock of the Fahey Banking Company (worth over $2 million), for no apparent consideration, to the account of Natalie Hughes at Merrill Lynch. On February 24, 2003, as a result of UTCU's failure to comply with the terms of the Supervisory Agreement, O'Donnell appointed ASI as the conservator of UTCU pursuant to OHIO REV. CODE § 1733.381.

On May 28, 2003, soon after the conservatorship was established, DFI instituted proceedings to remove Martin Hughes as a director and officer of UTCU pursuant to OHIO REV. CODE § 1733.181. Martin Hughes, however, was diagnosed as having chronic depression and dementia, and is now deceased. As a result of Hughes diagnosis, on May 9, 2003, Natalie

---

[3]Quote from the Supervisory Agreement.

7

Hughes filed an application for guardianship with the Cuyahoga County Probate Court and, ultimately, Martin Hughes' son, Carl F. Hughes, was appointed his guardian on September 25, 2003. On August 19, 2004, Carl Hughes, on behalf of Martin Hughes, entered into a settlement agreement (the "Settlement Agreement") with DFI, consenting to Martin Hughes' removal as an officer and director of UTCU. DFI issued its order removing Martin Hughes on September 3, 2004. On May 31, 2003, ASI removed the accrued benefits line item from UTCU's financial statements, effectively derecognizing it, because ASI did not believe that the 1999 Contract which established Hughes' death benefits was enforceable due to Hughes' alleged breach of fiduciary duties.

Substantial debate exists among the Parties as to when Hughes first made a demand for the alleged deferred compensation and benefits. Defendants claim that Hughes first made his demand for approximately $2M in deferred compensation on December 1, 2004, nearly two years after the appointment of ASI as conservator. ASI responded to this demand by requesting supporting documentation from Hughes' attorney. Hughes' attorney did not respond to this request.

Plaintiff states that on two separate occasions in March and April 2003, Hughes complained to ASI that he had not received "his paycheck or his 'pension.'"[4] Hughes' counsel, by a letter dated July 19, 2003 requested Hughes' "retirement or severance compensation" from UTCU's managing agent. Hughes' counsel made a similar request on December 1, 2004.

Substantial disagreement also exists among the Parties concerning whether Hughes received notice and a hearing before AFI cancelled the alleged benefits. Defendants contend that

---

[4]This information is taken from the deposition of Defendant Roberts.

8

Hughes received notice on several occasions. Specifically, Defendants note that DFI and ASI notified Hughes regarding the supervisory conference, that Hughes attended the conference and participated through his counsel, and that Hughes knew that the issue of employee benefits was at least in part, a topic of discussion at that conference. Furthermore, Defendants contend that the Supervisory Agreement provided Hughes with notice that DFI or ASI might take action against him.[5]

## B. PROCEDURAL HISTORY

Plaintiff filed this action on January, 24, 2005 and amended his complaint on February 25, 2005. In a motion dated March 2, 2005, Plaintiff requested a preliminary injunction against State Defendants. Defendants opposed this motion and moved to dismiss the amended complaint. Plaintiff sought leave from the Court to file a second amended complaint, which the Court granted. Plaintiff filed his Second Amended Complaint (the "Complaint") on April 6, 2005. On April 11, 2005, Plaintiff filed for a preliminary injunction based on the allegations in the Complaint. Plaintiff withdrew his motion for a preliminary injunction on May 5, 2005. Defendants filed a counterclaim against Plaintiff on April 26, 2005. Plaintiff moved for partial summary judgment on this counterclaim on May 3, 2005 and moved to dismiss the counterclaim on May 13, 2005. On September 23, 2005, this Court granted Plaintiff's motion for summary judgment and motion to dismiss Defendants' counterclaim.

On June 22, 2005, per an order from Magistrate Judge King, this case was consolidated with Civil Action No. 2:05-cv-424. Civil Action 05-424 has the same Defendants as this case

---

[5]The Supervisory Agreement states that DFI may take whatever action is necessary to "assure safe and sound operation" of the UTCU.

and UTCU is the plaintiff. In Civil Action 05-424, UTCU avers, among other things, that
Defendants appointed AFI conservator of UTCU in violation of the Fourteenth Amendment. On
October 23, 2006, UTCU and Defendants entered into a stipulation dismissing Civil Action 05-
424.

On April 28, Defendants filed a Motion for Summary Judgment as to Counts II and III of
Plaintiff's Second Amended Complaint. Plaintiff timely filed an opposition to this motion and
Defendant filed a reply memorandum. On May 5, 2006, State Defendants filed a Motion for
Partial Summary Judgment as to Count I of Plaintiff's Complaint and as to several counts in the
complaint of Civil Action 05-242. Plaintiff timely filed an opposition to this motion, Defendants
filed a reply memorandum, and Plaintiff filed a surreply. As Civil Action 05-242 has been
dismissed, this Court will only consider State Defendants' Motion for Partial Summary as it
applies to Count I of Plaintiff's Complaint. On May 5, 2006, Plaintiff filed a Motion for Partial
Summary Judgment with respect to several of Defendants' affirmative defenses. Defendants
timely filed an opposition to this motion and Plaintiff filed a reply memorandum. As such, all
three motions for summary judgment are now ripe for decision.

## III. STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show there is no
genuine issue as to any material fact and the moving party is entitled to judgment as a matter of
law." FED. R. CIV. P. 56(c). The movant has the burden of establishing that there are no genuine
issues of material fact, which may be accomplished by demonstrating that the nonmoving party
lacks evidence to support an essential element of its case. *Celotex Corp. v. Vatrett*, 477 U.S. 317,

10

322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). In response, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1995).

## IV. LAW and ANALYSIS

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has established that UTCU's board, as evidenced by the 1987, 1989, and 1999 Board Motions, at minimum, desired to compensate Hughes for the work he performed on behalf of UTCU. Whether UTCU's desire to compensate Hughes was motivated by self-dealing or nepotism, is not germaine to this case. The proper inquiry for the Court is whether UTCU's scheme to compensate Hughes constitutes an "employee benefit plan" or "employee welfare benefit plan" enforceable under ERISA. If

11

UTCU's compensation scheme is not enforceable under ERISA, summary judgment is appropriate on Counts II and III of the complaint.

### A. UTCU's Compensation Scheme Does Not Fall Under the Purview of ERISA

In their Joint Motion for Summary Judgment, Defendants contend that Plaintiff cannot establish the existence of an "employee pension benefit plan" or "employee welfare benefit plan" enforceable under ERISA. Under ERISA, an "employee benefit plan" may be either an "employee welfare benefit plan" and/or an "employee benefit pension plan." 29 U.S.C. § 1002(3); *Fugarino v. Hartford Life & Acc. Ins. Co.*, 969 F.2d 178, 183 (6th Cir.1992). ERISA applies to "any employee benefit plan if it is established or maintained by any employer engaged in commerce or in any industry or activity affecting commerce." 29 U.S.C. § 1003(a)(1). There is no dispute that UTCU was an employer engaged in commerce.

Title 29 U.S.C. § 1002(2)(A) defines an "employee pension benefit plan" and a "pension plan" as follows:

> [A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of **surrounding circumstances** such plan, fund, or program-
>
> (I) provides retirement income to employees, or
>
> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan. (emphasis added)

Title 29 U.S.C. § 1002(1)(A) defines an "employee welfare benefit plan" and "welfare plan" as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

For the purposes of this opinion, the Court will refer to the "employee welfare benefit plan" or the "employee pension benefit plan" simply as an "employee benefit plan," since the legal principles that apply to both are the same for the purpose of determining whether a plan is ERISA-qualified. Likewise, the Court will refer to UTCU's purported plan to compensate Hughes as the "compensation scheme."

Plaintiff does not make clear to the Court exactly how the elements of this compensation scheme come together to form a employee benefit plan. Plaintiff contends that his right to deferred compensation dates back to the 1987 Board Motion. He is also seeking money for deferred disability benefits and deferred death benefits but does not state exactly when these benefits arose. The 1989 Board Motion states that Hughes has a right to "salary and benefits" but does not make clear what these benefits are. Examining the facts, the Court also notes that the 1999 Board Motion gives Hughes a right to disability <u>and</u> death benefits in the amount of four times his salary. It appears that Plaintiff could either be claiming that death and disability benefits arise out of the 1989 Board Motion or the 1999 Board Motion. The 1999 Contract purports to gives Hughes a right to a death benefit of five times his salary.

Plaintiff is also suing for unpaid salary and unpaid vacation pay, which the Court will

13

assume stems from the 1999 Contract. What is clear to the Court is the fact that Plaintiff is suing for five separate items which were not established at the same time, and possibly not even established in the same decade. Plaintiff contends that these three motions, and possibly the 1999 Contract, meld together to establish an employee benefit plan that is covered by ERISA. The Court shall treat these three Motions and the contract together, refer to them as the "compensation scheme," and analyze whether this compensation scheme falls under ERISA's purview. It is not relevant that the different elements of the compensation scheme arose at different times or through different means; this fact will not prevent the compensation scheme from being an employee benefit plan covered by ERISA.

As their preliminary contention, Defendants argue that ERISA cannot govern the compensation scheme because an employee benefit plan is required to have a written document that sets forth certain elements of the plan such as a funding policy, a procedure for administering the plan, and a procedure for amending the plan. Under ERISA, "every employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1002(a)(1). The courts, however, do not construe this provision as exempting from ERISA's protection benefit plans that are not executed pursuant to a written instrument. *See Williams v. WCI Steel Co., Inc.*, 170 F.3d 598, 603 (6th Cir. 1999). In fact, a purported ERISA plan "need not be written or formal to qualify as an ERISA benefit plan." *Id. accord Fugarino v. Hartford Life Ins. Co.*, 969 F.2d 178, 185 (6th Cir. 1992). Moreover, "determining the existence of an ERISA plan is a question of fact to be answered in light of all the surrounding circumstances and facts from the point of view of a reasonable person." *Kolokowski v. Goodrich Corp.*, 448 F.3d 843,847-848 (6th Cir. 2006). (emphasis added)

14

Before articulating the test by which the court applies this reasonable person standard, it is important to address Plaintiff's contention that by asserting that ERISA preempts any state law claims that Hughes might have, Defendants have conceded that ERISA governs the compensation scheme. Defendants devote a page of their brief to stating that since Plaintiff has asserted his claim for benefits under ERISA, ERISA preempts all state law claims that Plaintiff might have. This argument is entirely unnecessary because Plaintiff has not made any state law claims. Plaintiff argues that since Defendants make the above contention regarding ERISA preemption, Defendant effectively concedes that ERISA governs the compensation scheme. Plaintiff's argument is completely without merit. Plaintiff states that ERISA preemption only applies where an employee benefit plan exists. Plaintiff claims that because Defendants are asserting ERISA preemption, then it follows that they concede that an ERISA benefit plan exists. Plaintiff has not cited any precedent which establishes this line of logic. It is Plaintiff, not Defendants, who has asserted that ERISA governs the compensation scheme. Defendants merely point out that it is Plaintiff who must proffer evidence to show that the compensation scheme is enforceable under ERISA.

In determining whether a benefit plan exists under ERISA, the operative test is that developed by the court in *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir.1982)(en banc). *See WCI*, 170 F.3d 598 at 603 n.3 ("The *Dillingham* test has been adopted by this court," (citations omitted) "as well as by every other circuit.") Under the *Dillingham* framework, a compensation scheme is governed by ERISA if a reasonable person examining the surrounding circumstances can ascertain: (1) the intended benefits; (2) the class of beneficiaries, (3) the source of financing; and (4) the procedures for receiving benefits. *WCI,* 170 F.3d at 603.

Defendants claim that the compensation scheme fails all four prongs of the *Dillingham* test. The Court disagrees. The compensation scheme has clearly satisfied prongs two and three of this standard. Regarding prong two, the class of beneficiaries, the 1987 and 1989 Board Motions make clear that Hughes is the intended beneficiary of the compensation scheme. The fact that the compensation scheme pertains to only one employee, Hughes, rather than to a group of employees, does not *ipso facto* exempt the compensation scheme from ERISA's protection. *See Williams v. Wright*, 927 F.2d 1540, 1545 (11th Cir. 1991) (noting that the court could not find anything in the ERISA legislation pointing to the exclusion of plans covering only a single employee); *Cvelbar v. CBI Illinois Inc.*, 106 F.3d 1368, 1376 (7th Cir. 1997) (remarking that an ongoing administrative scheme and reasonably ascertainable terms-program does not fall outside ambit of ERISA merely because it covers only single employee).

Likewise, the compensation scheme satisfies the third prong of the Dillingham analysis, the source of financing. While none of the three Board Motions establishes the exact source of financing for the purported employee benefit plan, the courts have routinely held that it may be assumed that benefits are to be paid out of the general assets of the employer. *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 18 (1987); *Wright*, 927 F.2d 1540 at 1544.

Whether the compensation scheme satisfies the first prong- the intended benefits - of the *Dillingham* test is a much closer question. Looking at the compensation scheme in its component pieces, it is unclear what benefits the scheme intended to confer upon Hughes. It is not enough that "some form of benefits exist;" the compensation scheme should specify the extent of the benefits and the form in which they are to come. *See WCI*, 170 F.3d at 603 *relying on Siemon v. AT & T Corp.*, 117 F.3d 1173, 1179 (10th Cir.1997) ("an informal plan to provide

16

payments of up to $1,000 to employees for death, sickness, accident, or financial emergencies was held not to be an ERISA plan because the 'potential benefits [were] too ephemeral and contingent for [the court] to ascertain, what, if anything, AT&T intends an employee to receive.'").

The *WCI* court also held that "claims for amorphous benefits" do no satisfy the first prong of the *Dillingham* test. *WCI,* 170 F.3d at 603. In *WCI*, a group of employees sought to have a memorandum agreement (the "memorandum agreement") declared to be a employee benefit plan under ERISA. *Id.* at 601. The memorandum agreement called for the creation of a $21M trust that would provide "employee and/or retiree benefits" to the employees if they lost their jobs. *Id.* The Sixth Circuit held that the memorandum agreement, despite stating the exact amount of the trust and that it was to be used for "retirement benefits," was not specific enough to satisfy the first prong of the *Dillingham* test. *Id.* at 603.

Looking at the component pieces of the compensation scheme, a reasonable person could not ascertain what the intended benefits were until at least 1999. The 1987 Board Motion only mentions salary. Salary is not covered by ERISA unless it is deferred. Moreover, the 1987 Board Motion does not mention the amount of salary in question. Plaintiff proffers that the 1987 Board Motion establishes a deferred compensation program for Hughes in the amount of $90,000 per year and offers his own testimony in support of this contention. Plaintiff also offers the existence of the accrued benefits line item on UTCU's financial statement of evidence of a deferred compensation element. This argument is belied by, among other things, the fact that this line item did not increase from 1992 to 2002. The 1989 Board Motion specifically states that UTCU would "set aside earnings to pay salary and benefits." Much like the "retirement benefits"

17

created by the memorandum agreement in *WCI*, the 1989 Board Motion does not state the nature of the benefits it purports to convey to Hughes nor does it explicitly state that these benefits were to be deferred.

The 1999 Board Motion did establish a death or disability benefit for Hughes in the amount of four times his salary and the employment contract raised the death benefit to five times his salary. This Court finds that the 1999 Board Motion and 1999 Contract are specific enough to satisfy the intended benefits prong of the *Dillingham* test. Plaintiff tries to argue that the 1999 Board Motion and 1999 Contract, by recognizing the previous motions, establish the intent of UTCU's board to create a deferred benefits plan as early as 1987. There is no evidence found in these documents to support this contention. The 1987 Motion and 1989 Motions are not specific enough by themselves to satisfy *Dillingham's* first requirement, the intended benefits prong. As such, this Court **GRANTS** summary judgment to Defendants in so far as it relates to any compensation for Hughes for the time period before the execution of the 1999 Board Motion.

Additionally, the entire compensation scheme fails the fourth prong of the Dillingham test because it lacks a procedure for receiving benefits. No where in any of the three motions, deposition testimony, or contract does the compensation scheme establish a procedure for Hughes to receive his alleged benefits. Plaintiff alleges that a reasonable person could assume Hughes would know from whom to seek or to obtain his benefits. This argument is contradicted by the fact that Hughes did not seek out any one particular person to demand his benefits before filing this action. During oral argument, Plaintiff could not proffer the name of the individual at UTCU who is in charge of administering benefits. In a letter to the Court post oral argument, Plaintiff alleges that Mr. Thomas E. Schuck is in charge of "administering [employee] payroll,

18

benefits, work hours, and environment." There is no evidence on the record, however, that Hughes ever approached Mr. Schuck to inquire about his benefits. Moreover, Mr. Schuck did not even begin his employment until 2003, well after the compensation scheme had been established. Furthermore, in the Complaint, Plaintiff admits that "neither the UTCU board of director compensation resolutions nor any other document . . . provides a claims procedure under which Hughes can file a benefit claim."[6] The *WCI* court struck down the memorandum agreement because in the court's "view, *Dillingham* requires more than just the existence of an administrative scheme. If a reasonable person cannot ascertain the claims procedures in a purported plan, then the plan is not an "employee benefit plan" under ERISA." *WCI.* 170 F.3d at 604.

Plaintiff retorts, by citing extraneous dictum from *Firestone,* that the absence of a written claims procedure does not foreclose ERISA from covering a given plan. *See Firestone Tire & Rubber Co. v. Brunch*, 489 U.S. 101, 105 (1989). In *Firestone*, the issues before the court were: 1) the appropriate standard of review for reviewing the denial of employment benefits; and 2) whether petitioners were in fact "participants" of an ERISA plan.[7] *See id.* at 109. The *Firestone* court did not directly address the issue of what constitutes an adequate claims procedure for the purpose of satisfying the *Dillingham* test. While it may be true that a written claims procedure is

---

[6]Plaintiff mentions this because ERISA also has an exhaustion requirement- i.e. he would have to seek remedies under the claims procedure before bringing suit. *See Borman v. The Great Atlantic & Pacific Tea Co., Inc.*, 64 Fed. Appx. 524 (6th Cir. 2003). Plaintiff is trying to have it both ways. On one hand , he is arguing that there is a claims procedure or there should not have to be one, and on the other hand is he is arguing that a claims procedure did not exist such that he should not be held to the exhaustion requirement.

[7]It was already established that the plans in question in *Firestone* were covered by ERISA.

not necessary to satisfy *Dillingham*, Plaintiff offers no evidence of any claims procedure, written or otherwise.

Plaintiff also relies on *Hollinghead v. Burford Equipment Co.*, 747 F.Supp. 1421 (M.D. Ala. 1990) to support his propositions that a written claims procedure is not necessary to satisfy *Dillingham* and that a court may assume what the claims procedure is from the surrounding circumstances. The court in *Hollingshead* was able to derive the method by which the plan in question contemplated its employees making claims because after the adoption of the plan "numerous employees attained retirement age, retired from their employment, and received pension benefits consistently thereafter." *Id.* at 1425. Thus, the court inferred based on how numerous employees actually collected benefits, what the claims procedure was. Regarding the compensation scheme in question, so far zero employees have collected any benefits. Thus, this Court is unable to determine what the claims procedure is.

Additionally, Plaintiff relies on *Petersen v. E.F. Johnson Co.*, 2002 WL 1975907 (D.Minn. Aug. 23, 2002), an unreported case, where the court found that a reasonable person could infer that the claims procedure for the plan in question was to contact the vice-president of human resources who, in a written document, was named the administrator of the plan. *See id.* at *2. The same written document also specified severance, medical, and dental benefits and gave an exhaustive list of the plan's participants. *See id. Petersen* is simply not analogous to Plaintiff's case. The Hughes compensation plan has no written document from which to ascertain the identity of claims administrator or which specified benefits and a list of plan participants.

Defendants offer even further support for their contention that ERISA does not govern the

20

compensation scheme. Defendants assert that the compensation scheme does not have an

ongoing administrative scheme as required under ERISA. In *Fort Halifax*, the Supreme Court

held that "the requirement of a one-time, lump-sum payment triggered by a single event requires

no administrative scheme whatsoever" and therefore ERISA did not preempt the benefits plan in

question. *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 12 (1987); *see also Sherrod v.*

*General Motors Corp.*, 33 F.3d 636, 638 (6th Cir. 1994) (holding that the pivotal inquiry in

determining if an ERISA plan exists is whether the compensation scheme requires the

establishment of a separate, ongoing administrative scheme to administer the plan's benefits).

Plaintiff retorts that the *Fort Halifax* requirement of an ongoing administrative scheme is

present in the Hughes compensation plan. Plaintiff also contends that the *Fort Halifax*

framework is only applicable in cases where the benefit plan in question is a severance package.

This argument has merit but is not complete statement of the law.

"The hallmark of an ERISA benefit plan is that it requires 'an ongoing administrative

program to meet the employer's obligation.'" *Kolokowski*, 448 F.3d at 848 *quoting Fort Halifax*

482 U.S. at 11 (1987). In *Kolokowski*. the court acknowledged that while the *Dillingham* test is

usually the operative test for determining whether an employees benefits plan is covered by

ERISA, the court "has not always employed [it] when determining whether an ERISA plan exists

in severance package cases." *Kolokowski*, 448 F.3d at 849. In severance package cases where the

employee in question may be paid in a lump-sum upon termination, the Sixth Circuit has adopted

the test developed in *Cassidy v. Akzo Nobel Salt, Inc.*, 308 F.3d 613 (6th Cir. 2002)[8], under which

---

[8] The *Cassidy* test is a truncated form of the test articulated in *Thompson v. Am. Home*
*Assurance Co.*, 95 F.3d 429, 434 (6th Cir. 1996). The *Thompson* test is a three prong standard
which examines: 1) the *Dillingham* factors; 2) whether the purported plan fits into the

21

the court examines "two particular factors to determine if a severance agreement plan meets the *Fort Halifax* criteria to determine if ERISA governs: 1) whether the employer has discretion over the distribution of benefits, and 2) whether there are on-going demands on an employer's assets." *Kolokowski,* 448 F.3d at 848.

Thus, establishing the presence of an ongoing administrative scheme, as required by *Fort Halifax*, is essential in a severance package case in determining whether the plan is covered by ERISA. The courts in severance package cases examine whether the plan in question had an administrative scheme in place, pre-termination, to distribute, calculate, and manage the benefits. This analysis is unnecessary in non-severance package employee benefits cases because the fourth prong of the *Dillingham* test, the requirement that employee benefits plans have a discernable scheme for receiving benefits, functionally incorporates the *Fort Halifax* requirement that an ERISA plan have an administrative scheme.

For example, in *WCI*, the employees attempted to use the fact that *Fort Halifax* only requires a simple administrative plan to show that memorandum agreement was covered by ERISA. *WCI*, 170 F.3d at 604. The court held that *Fort Halifax* was "of only limited relevance to this case since they dealt with issues of ERISA preemption, not ERISA qualification." *Id.* This case at bar also deals with ERISA qualification and not ERISA preemption. The *WCI* court, however, found that *Fort Halifax's* requirement of an administrative scheme was less stringent than *Dillingham's* requirement that the plan have an ascertainable claims procedure.[9] *Id.*

Department of Labor's "safe harbor regulations;" and 3) whether the plan was established with the intent of providing benefits to employees. *Id.* at 434-35.

[9] "In our view, Dillingham requires more than just the existence of an administrative scheme. If a reasonable person cannot ascertain the claims procedures in a purported plan, then

22

Like the employees in *WCI,* Plaintiff claims that a simple administrative scheme satisfies

ERISA. Plaintiff cites *Wright* to support this proposition. *Wright,* 927 F.2d 1540. The *Wright*

court held that a simple administrative scheme could satisfy the fourth prong under the

*Dillingham* test if it evinces a claims procedure that is adequately ascertainable. *Id.* In *Wright,*

the compensation scheme in question explicitly stated the way the beneficiaries would receive

payment. It further contained a clause that allowed for revision of the claims procedure in case it

did not fulfill the employees needs. *Id.* As such, the *Wright* court found that the plan satisfied

*Dillingham's* fourth prong. *Id.*

Unlike in *Wright,* the Hughes compensation plan has no ascertainable claims procedure.

Since the compensation scheme does not satisfy the fourth prong of the *Dillingham* test, this

Court finds that it is not an ERISA-covered plan. As such, this Court **GRANTS** Defendants'

Motion for Summary Judgment with respect to Count II of the Complaint.

### B. Breach of ERISA's Fiduciary Duties

In Count III of the Complaint, Plaintiff alleges that Defendants breached their fiduciary

duties under ERISA. Defendants state that because the compensation scheme is not an ERISA

plan, Defendants owe Hughes no fiduciary duties cognizable under ERISA. Defendants are

correct. For the reasons stated above, this Court found that the Hughes compensation scheme

was not an ERISA plan. Thus, any fiduciary duties proscribed by ERISA are inapplicable.

Therefore, this Court **GRANTS** Defendants' Joint Motion for Summary Judgment with respect

to Count III of the Complaint.

### C. Defendants Did Not Deprive Hughes of a Property Interest Without Due Process

the plan is not an 'employee benefit plan' under ERISA."

Plaintiff alleges that State Defendants violated Hughes' right to procedural due process under the Fourteenth Amendment. Specifically, Plaintiff argues that Hughes was entitled to receive notice and a hearing before State Defendants refused to give him benefits under the purported employee benefit plan. Defendants seek summary judgment as to Count I based on four separate theories: (1) that Hughes has not established a particularized property interest; (2) even if Hughes has established that he has a particularized property interest, there was no state action depriving him of it; (3) Hughes received adequate notice and an opportunity to be heard; and (4) the existing judicial process available to Hughes satisfies the Due Process Clause.

### 1. Hughes Has Established a Particularized Property Interest

Plaintiff must first show the existence of a particular property interest of which the State deprived Hughes in order to survive summary judgment on his due process claim. *See Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). State Defendants argue that Hughes has not done so.

State Defendants allege that since Plaintiff has failed to show the existence of an ERISA plan or right to any other governmental benefits, he has not established the existence of a particularized property interest. This Court finds this claim is without merit. While the Court agrees with State Defendants' assertion that Plaintiff has failed to establish a property interest in an ERISA benefit plan, he has presented evidence to suggest that Hughes had a contractual right to compensation or benefits from UTCU. The three UTCU board motions, the 1999 Contract, and the accrued benefits line item in UTCU's financial statements suggest that Hughes had a right to compensation from UTCU. Thus, Plaintiff has proffered enough evidence to show that Hughes might have a private contractual property right created by his private dealings with UTCU. State Defendants admit in their reply brief that Plaintiff had a right to pursue his claim

24

through a state law action for breach of contract against UTCU. Plaintiff, however, has not shown that Hughes had a state sponsored property interest.

The question is whether the courts recognize a purely private arrangement as a property interest protected by the Due Process Clause. Plaintiff cite a number of cases which they claim establish that the due process clause protects interests created through purely private arrangements. Most of these cases are inapposite because they refer to situations in which an employee was deprived of benefits purportedly owed to him by the state and not a private entity.

In its reply brief, Plaintiff specifically avers that the decision in *Liberte* dictates that it is a well-established principle that private arrangements are protected by the Due Process Clause. *Liberte Capital Group, LLC v. Capwill*, 421 F.3d 377. In *Liberte*, the court held that a property interest "can be created by a state statute, a formal contract, or a contract implied from the circumstances." *Id. citing Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir.2004). Additionally, this Court notes that it is "clear that a private contractual right can constitute a property interest entitled to due process protection from governmental interference under federal constitutional law." *Mertik v. Blalock*, 983 F.2d 1353, 1360 (6th Cir. 1993); *see also Brock v. Roadway Express, Inc.*, 481 U.S. 252 (1987). Thus, the compensation scheme can be a property interest protected by the Due Process Clause of the Fourteenth Amendment.

## 2. State Defendants Caused the Deprivation

State Defendants claim that they have not deprived Hughes of his alleged property right. State Defendants note that UTCU created the compensation scheme and if Plaintiff prevails in this case, then UTCU will pay Plaintiff. They aver that they are only seeking the same level of proof that this Court will ultimately require before they release the $2M in compensation to

25

Plaintiff. Since Plaintiff allegedly has not produced the requested proof to DFI, State Defendants assert that they have not deprived Plaintiff of any property right.

This Court finds that this argument is without merit. The State has control over ASI as conservator for UTCU. *See* R.C. 1733.361(B)(2).[10] State Defendants admit that ASI removed the accrued benefits line. ASI has also refused to pay Hughes' death benefit established by the 1999 Contract. Plaintiff has provided enough evidence to survive summary judgment which shows that he had a private contractual right to funds as outlined in the compensation scheme. The actions of the State served to deprive Hughes of his ability to collect benefits under the compensation scheme and thus deprived him of a purported property right[11].

### 3. Ordinary Judicial Process Satisfies Federal Due Process in this Case

State Defendants make two claims regarding what process is due Hughes in this case. First, State Defendants claim that the existing judicial process satisfies the requirements of federal due process. Second, they claim that Hughes had notice and a opportunity to be heard in the context of the supervisory hearing which also satisfies federal due process.

This Court has already concluded that the only property right Hughes can claim is one based on a private contract with UTCU. In *Lujan*, the Supreme Court concluded that if the State makes available ordinary judicial process for resolving a breach of contract claim, then federal due process has been satisfied. *See Lujan v. G & G Firesprinklers, Inc.*, 532 U.S. 189, 197

---

[10]Additionally, deposition testimony has shown that the State (through DFI) holds ultimate authority over the conservator.

[11]Hughes would still have to establish that the compensation scheme is enforceable in contract.

26

(2001); *see also BPNC, Inc. v. Estep*, No. 3:02CV7620, 2004 U.S. Dist. LEXIS 10738 at *28-29 (N.D. Ohio May 10, 2004) (Judge Carr holds that "when State law provides a means to enforce a contract claim, any property interest in that contract is fully protected by State law, thus, there is no due process violation"). Plaintiff claims that *Lujan* is inapplicable because the *Lujan* court does not specifically state that the constitution requirement of notice is waived if existing judicial process satisfies the Fourteenth Amendment. This Court's disagrees with that construction of *Lujan*. In *Lujan*, while the court does not specifically address the issue of notice, it makes it abundantly clear that the existing judicial process is enough to satisfy due process in a case where the only property right at issue is interference with a private contractual arrangement. Plaintiff does not cite any authority to the contrary.

During oral argument, Plaintiff asserted that *Lujan* is inapplicable because unlike the plaintiff in *Lujan*, Hughes has been denied a present entitlement; "respondent has not been denied any present entitlement, [rather respondent] has been deprived of payment that it contends it is owed under a contract." *Lujan* 532 U.S. 189 at 196. Hughes claim is quite similar to the respondent in *Lujan*. In this case, Hughes has not shown that he has a present entitlement. Rather, as discussed above, Hughes has established a property right only based on alleged contractual rights. State Defendants dispute these rights. In this case, Hughes may bring a common law breach of contract claim under state law which fully protects his interests. As such, this Court concludes that ordinary judicial process is available to him, and for that reason, federal due process has been satisfied.

Because the availability of existing judicial process satisfies federal due process for the purpose of this Case, this Court **GRANTS** State Defendants' Motion for Summary Judgment as

27

to Count I.

It is now unnecessary for the Court to address State Defendants' other argument that the supervisory hearing and subsequent communications constituted adequate notice for the purpose of federal due process.

### D. Plaintiff's Motion for Partial Summary Judgment with Respect to Several of Defendants' Affirmative Defenses

Given this Court's grant of summary judgment to Defendants on all remaining counts in Plaintiff's Complaint, it is unnecessary to address the Plaintiff's Motion for Partial Summary Judgment regarding Defendants' affirmative defenses. As such, the Court **dismisses** Plaintiff's Motion for Partial Summary Judgment regarding Defendants' affirmative defenses **as MOOT**.

### V. Conclusion

For the reasons stated above, this Court **GRANTS** Defendants' Joint Motion for Summary Judgment as to Counts II and III of the Complaint, **GRANTS** State Defendants' Motion for Summary Judgment as to Count I of the Complaint, and **DISMISSES as MOOT** Plaintiff's Motion for Partial Summary Judgment.

This case is dismissed.


**IT IS SO ORDERED.**

ALGENON L. MARBLEY
**UNITED STATES DISTRICT JUDGE**


**DATED: December 22, 2006**

28